## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**JOSEPH ANTHONY MCCLURE,**

      **Plaintiff,**

**v.**                                  **Case No.: 3:16-cv-06707**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social**
**Security Administration,[1]**

      **Defendant.**

### MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 5, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Acting Commissioner of the Social Security Administration, Nancy A. Berryhill, is substituted for former Acting Commissioner Carolyn W. Colvin as Defendant in this action.

## I.    Procedural History

Plaintiff Joseph Anthony McClure ("Claimant") completed an application for SSI on September 27, 2012, alleging a disability onset date of January 1, 2009,[2] due to "bipolar [and] manic depressive." (Tr. at 27-28, 148, 166). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 10, 81, 91). On September 20, 2013, Claimant filed a written request for an administrative hearing, which was held on October 29, 2014 before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 24-56). By decision dated December 12, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-20). The ALJ's decision became the final decision of the Commissioner on May 26, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1–3).

On July 27, 2016, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed her Answer and a Transcript of the Proceedings on September 22, 2016. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. Therefore, this matter is ripe for resolution.

## II.    Claimant's Background

Claimant was 31 years old at the time of his alleged onset of disability and 33 years old at the time of the administrative hearings. (Tr. at 10). He has a GED and is able to communicate in English. (Tr. at 165, 167). Claimant previously worked as a sales clerk, cashier/stocker, driver, and laborer. (Tr. at 167).

---

[2] At Claimant's administrative hearing before the ALJ, he amended the alleged onset date to the protected filing date of September 14, 2012. (Tr. at 27-28).

### III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A). The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to establish, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the

claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a

severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3).

In this case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since September 14, 2012. (Tr. at 12, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of mood disorder and anxiety disorder. (Tr. at 12-13, Finding No. 2). The ALJ also considered Claimant's history of polysubstance abuse, bipolar disorder, and chronic back strain; however, she found that these impairments were non-severe. (*Id.*).

At the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 14-15, Finding No. 3). Consequently, the ALJ determined that Claimant possessed the RFC to:

> [P]erform a full range of work at all exertional levels, but the following nonexertional limitations: the claimant can understand, remember, and carry out simple and complex tasks. He can respond appropriately to occasional interaction with coworkers and supervisors. The claimant can adjust to changes in a work routine in an environment free from teamwork, over-the-shoulder supervision, interaction with the general public, and fast-paced production requirements.

(Tr. at 15-18, Finding No. 4). The ALJ found that the Claimant had no past relevant work. (Tr. at 18-19, Finding No. 5). Accordingly, under the fifth and final inquiry, the ALJ reviewed Claimant's prior work experience, age, and education in combination with his RFC to determine if he would be able to engage in substantial gainful activity. (Tr. at 19-20, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1981 and was defined as a younger individual on the date that the application was filed; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Claimant did not have past relevant work. (Tr.

at 19, Finding Nos. 6-8). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 19-20, Finding No. 9). At the medium exertional level, Claimant could work as a janitor, cleaner, or stock clerk; at the light exertional level, Claimant could work as a janitor, assembler, or price marker; and at the sedentary exertional level, Claimant could work as a surveillance system monitor, assembler, or electronic worker. (*Id.*). Therefore, the ALJ concluded that Claimant had not been disabled as defined by the Social Security Act from September 14, 2012, through the date of the ALJ's decision. (Tr. at 20, Finding No. 10).

## IV. **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three challenges to the Commissioner's decision. First, he claims that the ALJ erred at step two of the sequential process when she determined that Claimant's chronic back strain was a non-severe impairment. (ECF No. 11 at 4). Claimant relies on the consultative examination performed by Dr. Kip Beard, who found that Claimant had "some discomfort on bending forward with paravertebral tenderness." He argues that this objective finding, combined with Claimant's subjective complaints of back pain, merit a finding that his chronic back strain is severe. (*Id.* at 5).

Second, Claimant asserts that the ALJ failed to properly consider the opinion of his treating psychiatrist, Marc Spelar, M.D. (*Id.* at 5-6). In particular, Claimant alleges that the ALJ should have adopted Dr. Spelar's opinion that Claimant would miss one to two days of work each month due to his psychological impairments. The ALJ gave significant weight to some of Dr. Spelar's function-by-function assessments, but rejected his opinion regarding missed workdays on the basis that the opinion was not supported by any evidence or rationale. Claimant accuses the ALJ of cherry-picking from Dr. Spelar's

RFC assessment.

Finally, in a related challenge, Claimant posits that the ALJ failed to properly consider the opinion of the vocational expert, who testified that Claimant would be precluded from gainful employment if he missed one to two days of work each month. Claimant contends that Dr. Spelar's opinion was entitled to controlling weight and, therefore, should have been accepted by the ALJ. Had the opinion been given the weight it deserved, Claimant would have been found disabled based on the vocational expert's testimony.

In response, the Commissioner argues that the ALJ's step two determination was correct, because Claimant's physical findings at Dr. Beard's examination did not demonstrate a severe back strain. (ECF No. 12 at 9-11). The Commissioner emphasizes that, to the contrary, Claimant was able to walk, sit, stand, and squat without difficulty, and his muscle strength and sensation were normal. While Dr. Beard noted some back tenderness on bending, he also confirmed the absence of spasm and a preserved range of motion.

With respect to Dr. Spelar's opinion, the Commissioner noted that the ALJ was not required to adopt the opinion *in toto*. (*Id.* at 11). In fact, the ALJ gave great weight to much of Dr. Spelar's RFC assessment, scrutinizing each aspect of it and reconciling any discrepancies. The Commissioner adds that the ALJ properly declined to give controlling weight to Dr. Spelar's opinion on missed workdays because the opinion was not consistent with other substantial evidence. In the Commissioner's view, the ALJ provided good reasons for rejecting that opinion and good reasons for adopting other portions of Dr. Spelar's RFC assessment. The Commissioner maintains that the reasons were supported by substantial evidence. Accordingly, the ALJ fully complied with agency standards.

The Commissioner further claims that the ALJ's acted appropriately in disregarding testimony by the vocational expert that was based upon Dr. Spelar's unsubstantiated opinion regarding Claimant's potential to miss workdays. The Commissioner indicates that this challenge is derivative of Claimant's position regarding Dr. Spelar, which has no merit. Consequently, this challenge is likewise unavailing.

## V.    Relevant Medical Records

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence, but has confined its summary of Claimant's treatment records and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

On February 29, 2012, Claimant presented to Prestera Centers for Mental Health ("Prestera"), with complaints of depression and anxiety as evidenced by his blunted expression, minimal eye contact, and lack of motivation. (Tr. at 253-56). Claimant also reported problems sleeping. Claimant had been examined by Dr. Kazi, a psychiatrist at Prestera, the week prior; however, he had refused medication recommended by Dr. Kazi on the basis that medication had never helped him in the past. Claimant told the licensed psychologist, Madeline Arrell, M.A., that he had lost his driver's license three years earlier due to legal issues. He tried to find work within walking distance to his residence, but was not successful. Therefore, he lived at home with his mother and isolated himself from others. Claimant reported being easily agitated, going for days without sleep and rarely leaving his home. Claimant had no history of psychiatric hospitalization, substance abuse counseling, or intensive outpatient counseling, but he had sought occasional counseling from Prestera in the past.

On examination, Claimant exhibited social isolation, blocked speech, deficient

coping skills, and a blunted affect. (Tr. at 274-80). His thought content was within normal limits; he was oriented in all spheres; and his recall memory was within normal limits. Claimant was diagnosed with mood disorder, not otherwise specified ("NOS"), and polysubstance dependency, episodic. He received a Global Assessment of Functioning ("GAF") score of 60.[3] Claimant agreed to participate in talk therapy and possibly reconsider his refusal to take medication.

At his therapy session on March 14, 2012, Claimant told Ms. Arrell he had been involved in a car accident in 2001 and sustained a back injury. (Tr. at 257). This "messed up" his back resulting in an inability to lift anything; in addition, he became nervous when he rode in a car with anyone. Claimant also reported that he was "very functional" until three years ago when he experienced an anxiety attack while at work that resulted in him being sent home. The business closed a few months later, so Claimant was out of work. Claimant spoke about applying for disability; however, he was not motivated enough to obtain information necessary to complete the paperwork.

Claimant attended therapy at Prestera six more times in 2012: March 28, June 6, June 20, October 10, October 24, and December 5. (Tr. at 258-63). He also canceled, or had canceled, ten additional appointments. (Tr.at 283-92). Claimant regularly expressed anger and depression at his therapy sessions. On March 28, Claimant was angry with his

---

[3] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). GAF scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

girlfriend when he learned that she had miscarried their baby and never told him. He was also frustrated about not being able to get a job. On June 6, Claimant told Ms. Arrell that his mother had to complete his disability application for him, because he was not motivated to finish it. (Tr. at 259). Claimant described his day as waking, showering, and then either going back to bed or sitting and listening sat to music. He did not want to be around people and did not like television. He blamed his depression on living in West Virginia, stating that people were friendlier in Florida. The topic of medication was raised; however, Claimant continued to refuse it as he did not like to feel "knocked out" all the time.

On June 20, Claimant appeared to be depressed with symptoms of anhedonia and lack of motivation. (Tr. at 260). Claimant told Ms. Arrell that he wanted to find work, but was in constant pain due to past accidents. Claimant continued to refuse medication, stating marijuana would help him function better. By October 10, Claimant reported he had been denied disability and had retained an attorney who suggested Claimant begin taking medication; however, Claimant was not willing to do so. (Tr. at 261). Claimant discussed his distrust of medication, his self-imposed isolation, and his lack of sleep. Claimant was fully oriented, demonstrating normal thought content; however, he appeared socially isolated, spoke rapidly, lacked sufficient coping skills, and presented a flat affect. Claimant was assessed with mood disorder, NOS, and was given a GAF score of 55. (Tr. at 264-70).

On October 24, Claimant reported racing thoughts, lack of sleep, and frustration with people. (Tr. at 262). Claimant still refused to take medications, because they made him feel emotionless. Claimant advised that he had recently learned that he might have a four-year-old son, and he was happy about the news, but was also nervous. Accordingly,

he got drunk. By his session on December 5, Claimant recognized that he was not improving and stated that he was tired, on edge, irritable, and continued to bite his fingernails to the quick. (Tr. at 263). Claimant discussed his preference for using pot and alcohol instead of psychotropic medication to control his symptoms. Claimant did note that his therapy sessions helped him and "worked better than any medication I ever took." (*Id.*).

Claimant presented for therapy at Prestera in 2013, beginning on January 2 and continuing therapy that year for another seventeen sessions. (Tr. at 235-247, 297-305). On January 2, 2013, Claimant discussed his stress level and lack of sleep. (Tr. at 235). Claimant was living with a friend instead of his mother. He admitted that his mother gave him Xanax pills, and they calmed his anxiety around other people. Claimant was not smoking marijuana anymore and felt his memory was improving. Claimant and Ms. Arrell discussed Claimant's refusal to take psychotropic medication and Ms. Arrell's belief that Claimant would function better with the right treatment. Claimant agreed to see Dr. Kazi again.

On January 16, 2013, Claimant told Ms. Arrell that he had not done much of anything since their session two weeks earlier. (Tr. at 236). He was depressed and had a "cloudy" sensorium. Claimant answered the questions put to him and was cooperative, but he was not initiating any of the discussion and had nothing in particular to say. Ms. Arrell ended the session early, as Claimant was simply sitting with his head on the table and yawning.

Claimant saw Dr. Kazi on January 30, 2013. (Tr. at 244-47). At that visit, Claimant appeared unkempt with agitated motor activity and guarded attitude. His eye contact and speech were within normal limits. Claimant's affect was labile; his thought process was

goal directed with appropriate thought content, and he appeared alert, although Dr. Kazi noted that Claimant appeared dismissive as he continued to check his cell phone for messages throughout the examination. Claimant told Dr. Kazi he wanted medication to control his anger and irritability. In addition, Claimant complained of anxiety, excessive worry, and sleep issues. Claimant told Dr. Kazi he remained sober; however, his mother gave him Xanax periodically. Claimant was assessed with episodic mood disorder, NOS, and polysubstance dependency, episodic. Claimant continued to maintain a GAF score of 60. Dr. Kazi prescribed Tegretol, and Claimant agreed to start the medication. Claimant also saw Ms. Arrell that day, but they had a shortened session in anticipation of Claimant's visit with Dr. Kazi.

Claimant returned to Dr. Kazi on February 13, 2013. (Tr. at 248-51). Claimant appeared agitated with a labile affect and guarded attitude, although his speech was normal, his thought process was goal directed, and his thought content was appropriate. Claimant's assessment and GAF score remained the same. Dr. Kazi prescribed Tegretol, Lamictal, and BuSpar.

Claimant presented for therapy with Ms. Arrell on March 27, 2013. Claimant told Ms. Arrell he had stopped taking the medication prescribed for him by Dr. Kazi, as "they ain't working." (Tr. at 238). Claimant appeared depressed with a constricted affect. Ms. Arrell described Claimant as resistant to any attempt to change or redirect his emotion, thought processes, or behaviors, as evidenced by taking his medication for only one month before quitting. Claimant complained of being "on edge" while waiting for a reconsideration decision from the SSA, stating that if he was awarded benefits, he would "be out of here." (*Id.*).

At his next session on April 10, Claimant presented with a euthymic mood and

broad affect. (Tr. at 239). He was not taking prescribed medication, but remarked that he "feels better now." (*Id.*). He met a new girl, who was living at the residence where he was living, and he liked her. Claimant spoke about his disability claim, acknowledging that waiting for a decision was stressful. He stated that he had not been able to look for work "on advice of his lawyer." Ms. Arrell predicted that if Claimant was denied disability benefits, his mood and level of agitation might change drastically.

Claimant returned to Prestera on May 2, 2013, complaining of an increase in symptoms related to his living situation, issues with his new girlfriend, and the denial of his Social Security disability claim. (Tr. at 240). Claimant appeared agitated with a constricted affect. He spoke about anger issues and agreed to restart medication to control his symptoms. When he presented for follow up on May 22, Claimant reported that Dr. Kazi had prescribed Lamictal, which Claimant was taking at double the regular dosage per Dr. Kazi's recommendation. Claimant complained that he felt "all over the place" with his emotions going from one extreme to the next. (Tr. at 241). He also reported having numerous arguments with his girlfriend and getting little sleep. Nevertheless, Claimant appeared more alert at this session, though more prone to agitation, with a dysphoric affect. Claimant agreed to continue his medication for another week to see if it would alleviate his symptoms.

Claimant returned on June 19, reporting to Ms. Arrell that he had left home for a few days and while gone, took "hard core stuff, cocaine, weed and alcohol." (Tr. at 242). Claimant also talked about trying to cut his wrists and said that his mother had given him three Xanax a day for the past three days to calm him. Ms. Arrell suggested that Claimant get crisis treatment, but he refused, likening Prestera's crisis unit to jail. He likewise resisted Ms. Arrell's suggestion that he look for work, stating "I don't trust myself out;

someone would make me mad." (*Id.*). Claimant had stopped taking Lamictal and told Ms. Arrell he was not interested in trying other medication.

Throughout his sessions with Ms. Arrell in July, August, September, and October, Claimant continued to complain of sleep and anger issues, relationship problems with his girlfriend, depression, and anxiety. (Tr. at 243, 297-303). On October 23, 2013, Claimant presented to Dr. Kazi again complaining of anxiety and sleep issues. (Tr. at 348-51). Dr. Kazi noted Claimant was not taking the prescribed medication. Claimant appeared agitated with a labile mood and guarded attitude. His speech was normal, his thought process was goal oriented, and his thought content was appropriate. Claimant's assessment and GAF score remained unchanged. Dr. Kazi prescribed Remeron, which Claimant agreed to try. Claimant also saw Ms. Arrell on October 23, 2013. (Tr. at 303). He reported sleeping disturbances, irritability, agitation, and anger directed toward other people. Claimant complained about his prior problems with work, and Ms. Arrell suggested that he contact the West Virginia Department of Rehabilitation for assistance.

Claimant returned to Ms. Arrell on November 6, 2013 with complaints of lack of sleep and depression. (Tr. at 304). Claimant reported that he had no motivation, was worried about his ongoing disability case, and was currently not taking the medication prescribed for him. Claimant complained about having no money and about living in his mother's home with a cousin who did nothing but eat and watch television. Claimant appeared depressed and anxious with a relaxed, broad mood. Ms. Arrell suggested Claimant obtain a punching bag to help him exercise and relieve tension.

On December 5, 2013, Claimant returned for therapy with Ms. Arrell. (Tr. at 305). Claimant reported his "nerves were shot" and he had been biting his fingernails down to the quick. Claimant appeared anxious with a broad affect. He reported that he and his ex-

girlfriend had started seeing each other again and he was not sure how he felt about their relationship. He continued to worry about his disability claim and resisted any change in thoughts to redirect him from his emotions about the claim.

Claimant participated in therapy at Prestera with Ms. Arrell in 2014; attending sixteen sessions in addition to being examined throughout the course of that year by Marc Spelar, M.D. (Tr. at 306-26, 338-47, 352-55, 356-59, 360-64). On January 15, 2014, Claimant told Ms. Arrell that he felt stressed due to family issues. (Tr. at 306). Claimant reported that he was working at a fast food restaurant one day a week but relayed that having to get dressed and go to work made him feel "physically sick" and he "scream[ed] really loud" on his way home because he knew he had to "go back the next day." (*Id.*). Claimant complained that he hated "stupid" people and resented someone younger than him telling him when he could take a smoking break. Claimant's mood was depressed; his affect was broad. Claimant indicated that he was attempting to schedule an appointment with the physician at Prestera in order to obtain medication for his "nerves."

Claimant continued to feel anxious and depressed at his sessions in January and February, although he remained employed, working 12-14 hours per week. (Tr. at 307-08). Claimant expressed his distaste at having to deal with other people, indicating that he grew impatient with people who "just want to talk" when he did not "want to listen to them." (Tr. at 307). He had developed a new hobby of playing internet chess and mahjong and felt that these games helped him to relax. Claimant also discussed his stress over his relationship with his girlfriend, whom he described as being "very moody." (Tr. at 308).

On February 11, 2014, Claimant saw Dr. Marc Spelar, requesting help for control of his mood swings, anxiety and irritability. (Tr. at 352-55). Claimant presented with an appropriate affect, normal eye contact, and motor activity. His thought process was goal

directed and logical. Claimant demonstrated appropriate thought content and appeared alert. Claimant continued to maintain a GAF score of 60. Dr. Spelar recommended Claimant continue taking Remeron and begin taking BuSpar; however, he declined to refill Claimant's prescription for Valium.

On March 12, Claimant reported to Ms. Arrell that he was terminated from his employment as he had trouble reading the schedule and had missed his shift twice; however, he took consolation in the thought that he did not "like that job anyway." (Tr. at 309). Claimant admitted during the course of his session that he was procrastinating looking for another job, because the weather was nice and he currently had some money. At this time, Claimant appeared more relaxed, less depressed, and had a broad affect. On April 9, 2014, Claimant advised Ms. Arrell that he was having more trouble with his girlfriend and was stressed that his lawyer had not returned six telephone calls that Claimant placed to him in the past two weeks. (Tr. at 310).

Claimant presented to Dr. Spelar on April 22, 2014. (Tr. at 356-59). Claimant told Dr. Spelar he missed the prior week's dose of BuSpar but was continuing to take Valium as it helped relieve his anxiety. During the examination, Claimant appeared cooperative, with normal speech and motor activity. His mood was "ok" and his affect appropriate. Claimant was alert, demonstrating logical, goal directed thoughts. Dr. Spelar observed that Claimant's gait was within normal limits. Neither Claimant's assessment, nor his GAF score changed from his prior examination. Dr. Spelar prescribed a course of Valium, advising Claimant he could refill the present dose upon request as appropriate. In addition, Dr. Spelar advised Claimant to begin taking BuSpar.

Throughout his therapy sessions in April, May, and June 2014, Claimant complained of feeling depressed, anxious, and angry. (Tr. at 310-17). Claimant reported

at his April 22 session that he had stopped taking BuSpar because it did not relieve his symptoms. (Tr. at 311). Claimant stated that he was very angry with his mother and cousin. According to Claimant, his cousin lived with Claimant and his mother and ate all the food in the house. The cousin weighed 400 pounds, had Crohn's Disease, and did not care properly for himself. Claimant described his mother as an enabler, indicating that she tended to the cousin's every need, even though he was capable of doing some things for himself. Claimant also advised that he and his girlfriend fought constantly, and he wanted her to move out of the residence, but had not taken steps to accomplish this.

On May 7, Claimant told Ms. Arrell that he had "put out" his girlfriend a week earlier, went to a bar to celebrate his freedom, and consumed twelve beers. (Tr. at 313). Claimant admitted to taking two Valium before the counseling session, which gave him a "chilled out mood." Claimant discussed feeling anxious over his disability application, stating that he was waiting for a hearing on the application to be scheduled. He had finally heard from his lawyer, who thought it would be another few months before he would know when the hearing would take place. In the meantime, Claimant planned to look for a part-time job. He returned to Ms. Arrell for therapy on May 21, June 4, and June 18. Each time, Claimant advised that he was staying away from people, had sleep issues, and was worried about his disability claim. (Tr. at 314-17).

When Claimant appeared on July 2 for therapy with Ms. Arrell, he reported sleep issues and a desire to stay away from other people, comparing himself to a "hibernating bear." (Tr. at 318). Claimant was taking BuSpar, but had missed one week, and Valium, which he took every other day. Claimant exercised by mowing the lawn every 5-6 days. Claimant appeared depressed with a constricted, blunted affect. Ms. Arrell noted that Claimant's current medications had shown some efficacy, although monitoring was

required as he was non-compliant with the medication protocol. (Tr. at 341). Claimant demonstrated social isolation, deficient coping skills, and thought blocking; however, his speech, appearance, and recall memory were normal.  (Tr. at 343-44). Claimant was assessed with mood disorder, NOS, with a GAF score of 55.

One week later, on July 9, Claimant was examined by Dr. Spelar. (Tr. at 360-64). Claimant admitted to Dr. Spelar that he was not taking BuSpar as prescribed, because he did not want to use any medication that had to be taken on a regular or daily basis, and he did not feel it relieved his symptoms. Claimant did take Valium, but noted that marijuana worked better at controlling his anxiety. While he did have some symptomology that bordered on panic disorder or panic attack, Dr. Spelar did not believe Claimant met the criteria for either diagnosis. On examination, Claimant was alert, cooperative, and pleasant with normal speech, appropriate affect, logical and goal directed thought process, as well as appropriate thought content. Claimant was assessed with episodic mood disorder, NOS, and combination drug dependency, episodic. Dr. Spelar noted Claimant had a history of cocaine, marijuana, and alcohol abuse, reported by Claimant to be in full, sustained remission as to the drugs and early partial remission as to alcohol. His GAF score was 60. Dr. Spelar decided to discontinue BuSpar and start Claimant on Inderal for anxiety. (Tr. at 363).

Claimant returned for therapy with Ms. Arrell on July 30, 2014, stating that he was having a "pretty good day." (Tr. at 319). Claimant advised that he was taking Valium and Inderal, although not on the same day, and had stopped taking BuSpar, because he did not want to maintain a strict schedule. Claimant's mood was euthymic and his affect was congruent. Ms. Arrell remarked she had never seen Claimant this rested or relaxed.

On August 27, Claimant presented for therapy with Ms. Arrell. He continued to

take the prescribed medication, but admitted taking more Valium in a day than the recommended dose. (Tr. at 320). Claimant described feelings of agitation and depression, and reported having family conflict. He stated that he had experienced a "borderline panic attack" in Walmart recently, because "there was so much going on there." (*Id.*). Claimant told Ms. Arrell he was still angry with his mother and cousin and would not do tasks that his mom asked him to do, such as mowing the lawn, because he did not like taking direction from anyone. His mood at this session was depressed and agitated, and his affect was somewhat constricted.

Claimant continued his therapy sessions in September and October 2014. On September 10, Claimant's mood was stable with a broad affect. (Tr. at 322). He reported going to the beach with a friend, but had to "triple his medication" and sleep in order to tolerate the drive. He continued to avoid going out in public and to avoid people. Claimant had a disability hearing scheduled and found himself dwelling on the upcoming hearing. Ms. Arrell discussed Claimant's diagnosis with him. She confirmed with Claimant that he was not diagnosed with bipolar disorder.

At his September 24 session, Claimant reported having gone out for an evening, gotten drunk, and spent the night at a female friend's apartment. He awoke with the friend's ex-boyfriend punching him in the face. Claimant's orbital socket was fractured, and he had injuries to his face. (Tr. at 324). Claimant received pain medication at the hospital and was taking that in place of his psychotropic medication. During the session, Claimant expressed anger at the man who beat him and distrust of the legal system. Claimant had gone to court on charges filed against the man, but the man did not show up for the hearing. On October 8, Claimant stated that he was still recuperating from the attack. (Tr. at 326). He expressed some concern over the way his wounds were healing.

Claimant also reported that he was "super freaking out" over his disability hearing, which was to be held in three weeks. He admitted that he did not know what he would do if the decision did not go in his favor.

### B. Consultative Examinations and Opinion Evidence

On March 11, 2013, Elizabeth A. Bodkin, M.A., completed a mental status examination and clinical interview at the request of the Disability Determination Service. (Tr. at 225-28). Ms. Bodkin observed that Claimant had normal gait and posture and did not require the use of any device to ambulate. He was cooperative with a good attitude. Claimant reported that he lived with his mother and had no income. He stated that he had applied for disability benefits because he "was not functioning in society. I get so tensed up around people. If somebody looks, I fester inside and I'm super on edge and super jumpy." (Tr. at 225). Claimant indicated that his symptoms started years earlier. (Tr. at 226). He described difficulty sleeping and an anxious mood; however, Ms. Bodkin found no evidence of phobias, panic attacks, obsessions, compulsions, or posttraumatic stress symptoms. Claimant treated with Prestera every other week and took BuSpar. He had a history of one admission to Prestera's crisis unit, which had occurred approximately three years prior and lasted for one week. Claimant denied current use of illegal drugs, although he admitted to a history of daily cocaine use for a period of two years, with the last use being one year ago. Claimant had also tried other recreational substances in the past and had abused Xanax. With respect to school and work history, Claimant stated that he completed the 11th grade, but dropped out of school at age 15 because he "wasn't learning anything." (Tr. at 226). He last worked for a delivery service and as a cashier, but had not worked for three years. Claimant admitted to four arrests for charges including drug paraphernalia, assault, and destruction of property.

On examination, Claimant made good eye contact, interacted appropriately, and provided adequate verbal responses. He was fully oriented, but had a dysphoric mood and restricted affect. His thought processes, thought content, and speech were normal. Claimant showed fair insight, and his judgment was within normal limits. His immediate, recent and remote memory was within normal limits. Ms. Bodkin found Claimant's concentration and persistence mildly deficient; however, his psychomotor behavior was within normal limits, as was his pace. Ms. Bodkin diagnosed Claimant with bipolar disorder, NOS, and anxiety disorder, NOS. She explained that the diagnosis of bipolar disorder was based upon Claimant's report of symptoms and his treatment at Prestera. The diagnosis of anxiety disorder was based upon Claimant's report of frequent anxiety and worry. Ms. Bodkin felt that Claimant's prognosis was fair, and he currently had the ability to manage his own finances.

Kip Beard, M.D., performed a consultative internal medicine examination at the request of the Disability Determination Service on March 19, 2013. (Tr. 220-23). Claimant's chief complaint was a back injury secondary to a motor vehicle accident in 2001. Claimant described constant mid to lower back pain that was dull to sharp, became sharper with activity, and averaged an eight on a ten-point pain scale. He indicated that lifting, bending, or standing repetitively exacerbated the pain, and he had days when he "cannot move out of the bed." Claimant also mentioned he could play basketball for about twenty minutes before his back would begin to hurt. As for treatment, Claimant reported participating in physical therapy and taking pain medication in 2001. However, Claimant did not have health insurance and was not receiving any treatment at the time of the examination. Claimant also advised Dr. Beard that he had bipolar disorder and took BuSpar.

Claimant's review of systems was essentially negative except for back pain. (Tr. at 221). He denied any neurological, respiratory, cardiovascular, and gastrointestinal symptoms. Dr. Beard did not have treatment records to review prior to examining Claimant.

On examination, Claimant could walk normally without any assistive devices. He could stand unassisted, rise from a seated position, and step up and down from the table without issue. He appeared comfortable both in the seated and supine positions. Claimant's head, neck, throat, eyes, ears, chest, cardiovascular system, abdomen, and extremities were all normal. (Tr. at 222). An examination of the cervical spine revealed no spinous process or muscular tenderness, and no evidence of paravertebral muscular spasm. Range of motion of the cervical spine was without limitations. Claimant's arms, shoulder, hands, elbows, wrists, knees, ankles, and feet were without tenderness, redness, warmth, swelling, effusion, laxity, nodules, or crepitation. Range of motion of these limbs and joints was normal. Claimant could pick up coins with both hands and write with the dominant hand without difficulty. Examination of Claimant's dorsolumbar spine revealed a normal curvature and normal range of motion; however, Claimant complained of mild discomfort with forward bending with some paravertebral tenderness, although no spasm was noted. Claimant could stand on one leg without issue. His hips were pain free with normal range of motion. A seated and supine straight leg raising test was asymptomatic at 90 degrees on the right side, but Claimant had mild discomfort behind the knee on the left side. However, he had no weakness, atrophy, or sensory loss indicative of radiculopathy. The remainder of Claimant's neurological examination was likewise unremarkable. Deep tendon reflexes of the biceps measured 2+, of the triceps 1+, of the patellae 2+, and of the Achilles 1+. Claimant could heel-walk, toe-walk, tandem walk and

squat. Dr. Beard assessed Claimant with chronic thoracolumbar strain.

On April 15, 2013, Ann Logan, Ph.D., completed a Psychiatric Review Technique, finding Claimant had medically determinable impairments of affective disorder (Listing 12.04) and anxiety disorder (Listing 12.06); however, the combination of impairments was not severe and did not precisely satisfy the diagnostic criteria. (Tr. at 69-70). Dr. Logan found Claimant mildly limited in his restriction of activities of daily living, maintaining social function, concentration, persistence and pace; he had no episodes of decompensation and no evidence to establish the presence of the "C" criteria. Dr. Logan determined that Claimant was partially credible as she found his allegations were not fully supported by the medical records. On August 2, 2013, Karl G. Hursey, Ph.D., opined on reconsideration that Claimant's mental impairments were not alleged to have worsened nor were there any new allegations of mental impairments. (Tr. at 77-78). In addition, Claimant's activities of daily living had not changed, and there were no new medical records for review. Dr. Hursey evaluated the available evidence and confirmed Dr. Logan's assessment as written.

On April 11, 2013, Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 70-71). Dr. Franyutti opined that Claimant did not have any exertional limitations in lifting, carrying, walking, standing, sitting, pushing or pulling or any non-exertional limitations including postural, manipulative, visual, communicative, or environmental. Claimant was found to have a physically non-severe RFC. On August 5, 2013, A. Rafael Gomez, M.D., completed an RFC with findings identical to those of Dr. Franyutti. (Tr. at 79).

On October 27, 2014, Marc Spelar, M.D., completed an Ability to do Work-Related Activities (Mental) form. (Tr. at 293-96). At that time, Claimant's diagnoses were mood

disorder, NOS, and anxiety disorder, NOS. His current GAF score was 60, which was also his highest score during the past year. Claimant's medication regimen included Valium, Topamax, and Inderal. Dr. Spelar opined that Claimant's mental impairment and symptoms were moderate, and his prognosis was fair with adherence to treatment. On a function-by-function basis, Dr. Spelar opined that Claimant had no limitations in understanding, remembering, and carrying out simple instructions and making judgments on simple work related decisions; he had mild limitations with understanding, remembering, and carrying out complex instructions and responding appropriately to usual work situations and changes in a routine work setting. (Tr. at 294). Claimant had moderate limitations in interacting appropriately with the public, supervisors and co-workers. As for Claimant's signs and symptoms, Dr. Spelar noted that Claimant had no signs or symptoms of: loss of interest in most activities, appetite disturbance, thoughts of suicide, inappropriate affect, poverty of speech content, persistent generalized anxiety, recurrent and intrusive recollection of traumatic events, pathological dependence, pathological passivity or aggressiveness, paranoid thinking, recurrent obsessions or compulsions causing marked distress, seclusiveness, incoherence, isolation, bipolar syndrome, disorientation to time and place, thinking disturbances, hallucinations, delusions, hyperactivity, catatonia, emotional inability, flight of ideas, mania, inflated self-esteem, unrealistic interpretation of physical signs and sensations, loose associations, pathological suspiciousness or hostility, oddities of thought, oddities of perception and speech, oddities of behavior, or a decreased need for sleep. (Tr. at 294-95). He had mild signs and symptoms of decreased energy, feelings of guilt or worthlessness, impairment of impulse control, psychomotor agitation or retardation, persistent disturbances of mood or affect, apprehensive expectation, emotional

withdrawal or isolation, persistent irrational fear of a specific object, activity or situation, intense and unstable interpersonal relationships, motor tension, deeply ingrained, maladaptive patterns of behavior, easily distracted, memory impairment, sleep disturbance, and panic attacks. He had moderate signs and symptoms of mood disturbance and difficulty thinking or concentrating. Dr. Spelar also opined that, on average, Claimant's impairments would cause him to be absent from work one to two days per month. (Tr. at 295).

## VI.  **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of §

205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  Discussion

Claimant challenges the ALJ's step two determination and lodges two related criticisms arising from the weight given by the ALJ to Dr. Spelar's RFC assessment. The Court will address the first challenge separately and will discuss the related challenges together.

### A.  ALJ's Step Two Determination

At the second step of the disability determination process, the ALJ found that Claimant had severe impairments of "mood disorder and anxiety disorder." (Tr. at 12). The ALJ also considered Claimant's history of polysubstance abuse, bipolar disorder, and chronic back strain, but did not find any of these conditions to be severe. (Tr. at 12-13). With respect to Claimant's chronic back strain, the ALJ reviewed in detail the examination findings of Dr. Kip Beard and ultimately concluded that "the claimant's back strain is a non-severe impairment because the claimant has not received treatment for it for many years according to his own report, and Dr. Beard's examination showed minimal evidence of impairment." (Tr. at 13). Claimant argues that the ALJ "failed to properly consider the opinion of Kip Beard" and ignored Claimant's subjective complaints of severe back pain.

Title 20 C.F.R. §416.920 explains the five-step process followed by an ALJ when evaluating an application for SSI. At the second step of the process, the ALJ must determine whether the claimant has an impairment or combination of impairments that is severe. *Id.* at §416.920(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." *Id.* at § 416.922. Basic work activities are "the abilities and aptitudes necessary to do most jobs." *Id.* Examples of basic work activities include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

*Id.* The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a potentially disabling impairment, the severe impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

In this case, substantial evidence supports the ALJ's determination that Claimant's

chronic back strain was not a severe impairment. The only medical evidence relevant to Claimant's back strain was the report prepared by consultative examiner, Dr. Kip Beard. As the ALJ noted, at the examination, Claimant walked with a normal gait; required no ambulatory aids; stood unassisted; rose from a seated position with ease; and could step up and step down from Dr. Beard's examination table without difficulty. (Tr. at 221). Claimant was comfortable in both the sitting and supine positions, and he could heel-walk, toe-walk, and tandem walk. Although Claimant complained of some tenderness and discomfort on forward bending, his spinal range of motion was normal and there was no evidence of muscle spasm. Claimant could stand on one leg without difficulty; had no leg length discrepancy, muscle weakness, or atrophy; his sensations were intact; his reflexes were symmetric; and he complained of only mild, nonspecific discomfort behind the left knee on bilateral straight leg raise. Claimant produced no medical evidence demonstrating that his mild back discomfort actually limited his ability to do any basic work activity. In addition to the unremarkable findings on examination, two non-examining medical sources reviewed the file and found that Claimant had no severe physical impairment. (Tr. at 70-71, 79). Finally, the ALJ reasonably took into account that the underlying injury to Claimant's back, which he claimed to be the source of his chronic strain, occurred long before the alleged onset of disability and had not required any medical care for many years.

Therefore, the Court finds that the ALJ did not err in her determination that Claimant's back strain was a non-severe impairment. Claimant bore the burden of establishing the nature of the impairment and its limiting effect on his ability to work. He simply failed to meet that burden.

## B. Dr. Spelar's Opinion

Claimant asserts two related challenges concerning the weight the ALJ gave to the RFC assessment of Dr. Spelar, Claimant's treating psychiatrist. Specifically, he contends that the ALJ failed to properly weigh Dr. Spelar's opinion that Claimant would miss one to two workdays per month due to psychological symptoms or treatment. Claimant adds that if the ALJ had properly weighed Dr. Spelar's opinion, she would not have rejected the testimony of the vocational expert, who confirmed that missing one to two days of work per month would preclude Claimant from obtaining gainful employment. The Court finds these challenges to be without merit.

For SSI claims filed before March 27, 2017, 20 C.F.R. § 416.927(c) outlines how medical opinions will be weighed in determining whether a claimant qualifies for benefits. In general, the SSA will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. § 416.927(c)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* at § 416.927(c)(2). Indeed, a treating physician's opinion will be afforded controlling weight if two conditions are met: "(1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also,* 20 C.F.R. § 416.927(c)(2).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. *Id.* at § 416.927(c)(2). If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in

§ 416.927(c)(2)-(6). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. *Id.* "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *1 (Jul. 2, 1996). In order for a claimant to understand (1) why a treating source's opinion was not given controlling weight and (2) how the opinion was used by the Commissioner in reaching his determination, the SSA, through the ALJ, "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 416.927(c)(2). In Social Security Ruling 96-2p, the SSA further explains the ALJ's obligation to explain the weight given to a treating source's medical opinion (i.e. on the nature and severity of an individual's impairment), stating as follows:

> When the determination or decision: is not fully favorable, e.g. is a denial ... the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

*Id.* at *5.

Here, the ALJ thoroughly reviewed the records from Claimant's counseling sessions and psychiatric visits. (Tr. at 17-18). She then analyzed and discussed all of the opinion evidence. (Tr. at 18). The ALJ gave no opinion controlling weight; thus, she weighed each one as required by Social Security rules and regulations. Beginning with the non-examining consultants, the ALJ noted that they found Claimant's mental impairments to be non-severe. The ALJ gave some weight to the opinions, but discounted

them to a degree, because the consultants did not have access to all of Claimant's mental health treatment notes and did not see the RFC assessment prepared by Dr. Spelar.

Looking next at Dr. Spelar's RFC assessment, the ALJ discussed his function-by-function findings and gave them significant weight, with the exception of his opinion that Claimant would miss one to two days of work per month due to psychological impairment or treatment. The ALJ explained that this particular opinion was given little weight, because Dr. Spelar provided no rationale or supporting evidence to verify the existence of such a limitation. The Court finds no error with the ALJ's conclusion. Certainly, the ALJ acted appropriately in assessing the supportability of Dr. Spelar's function-by function assessment and in rejecting any portion of the assessment that was not bolstered by the record. Furthermore, as the Commissioner points out, an ALJ may give great weight to an expert's opinion without incorporating every one of the expert's findings and limitations. *See, e.g., Laing v. Colvin,* No. SKG–12–2891, 2014 WL 671462, at *10 (D. Md. Feb. 20, 2014) ("Although the ALJ accorded 'great weight' to the state agency psychologists, he was not required to adopt every single opinion set forth in their reports.") (citing *Bruette v. Comm'r Soc. Sec.,* No. SAG–12–1972, 2013 WL 2181192, at *4 (D. Md. May 17, 2013). The Claimant's RFC is an administrative finding based upon the entire record, not an isolated medical opinion. *See Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (recognizing that RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record, not a medical opinion); *See, also,* SSR 96-8P, 1996 WL 374184, at *2  (S.S.A. July 2, 1996) ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related

physical and mental activities."). In this case, the ALJ conducted a comprehensive analysis of the record and, based on the evidence as a whole, crafted Claimant's RFC finding. Therefore, the ALJ complied with the applicable rules and regulations in determining Claimant's RFC.

In addition, the ALJ provided good reasons for rejecting Dr. Spelar's opinion regarding missed workdays. Dr. Spelar's opinion was in the form of a checklist. (Tr. at 293-96). He did not add any written explanation for his findings, nor did he point to any specific records as corroborative of his opinions. Furthermore, the reason for his belief that Claimant would miss one to two workdays per month is not obvious from the rest of his RFC assessment. To the contrary, a majority of the psychological signs and symptoms contained on the checklist were assessed by Dr. Spelar as being mild or non-existent in Claimant's case. In addition, all of the work-related tasks that were moderately limited by Claimant's mental impairments involved interactions with other people. The ALJ clearly accounted for that problem by limiting Claimant to work "in an environment free from teamwork, over-the-shoulder supervision, [and] interaction with the general public." (Tr. at 16). Consequently, the ALJ's explanation for rejecting Dr. Spelar's opinion regarding missed workdays was both clear and reasonable.

Given that substantial evidence supports the ALJ's rejection of Dr. Spelar's opinion regarding missed workdays, the ALJ did not err in disregarding the vocational expert's testimony based on a hypothetical question that incorporated the opinion. In order for a vocational expert's testimony to be relevant, it must be in response to a proper hypothetical question that sets forth the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical

and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). "The Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

When the ALJ provided the vocational expert with a hypothetical question that fully and accurately reflected Claimant's RFC finding, the vocational expert testified that Claimant could not do any of his past work, but could perform other jobs that existed in significant numbers in the economy. (Tr. at 53-54). The vocational expert confirmed that her opinions were consistent with the Dictionary of Occupational Titles. Thus, the ALJ properly relied upon this testimony in making the disability determination.

**VIII.** <u>**Conclusion**</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Therefore, the Court **DENIES** Plaintiff's motion for judgment on the pleadings, **GRANTS** Defendant's

request that the Commissioner's decision be affirmed, and **DISMISSES** this action from the docket of the Court. A Judgment Order shall be entered accordingly.

The Clerk of this Court is directed to transmit copies of this Memorandum Opinion to counsel of record.

**ENTERED:** May 11, 2017

Cheryl A. Eifert
United States Magistrate Judge